**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |  |
|---|---|---|
| | * | |
| **WILLIAM WOJTKOWSKI,** | | |
| | * | |
| **Plaintiff,** | | |
| **v.** | * | **Case No.: GJH-17-2399** |
| | | |
| **GINA RAIMONDO, SECRETARY,** | | |
| **U.S. DEPARTMENT OF COMMERCE,[1]** | * | |
| | | |
| **Defendant.** | * | |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

**MEMORANDUM OPINION**

This is a federal-sector employment discrimination case brought by Plaintiff William

Wojtkowski against the U.S. Department of Commerce for alleged violations of Title VII of the

Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") and the Age Discrimination in

Employment Act of 1967, as amended, 29 U.S.C. §§ 621 *et seq.* ("ADEA"). Pending before the

Court is Defendant's Motion for Summary Judgment. ECF No. 39.[2] No hearing is necessary. *See*

Loc. R. 105.6 (D. Md. 2018). For the following reasons, Defendant's Motion for Summary

Judgment is granted.

---

[1] In the case caption of his Amended Complaint, Plaintiff identifies Wilbur Ross as the Secretary of the United States Department of Commerce. ECF No. 23-1. On March 3, 2021, Gina Raimondo assumed the role of the Secretary of the United States Department of Commerce. Pursuant to Federal Rule of Civil Procedure 25(d), when a public officer is named as a defendant in an action in his or her official capacity, and subsequently "dies, resigns, or otherwise ceases to hold office while the action is pending," "[t]he officer's successor is automatically substituted as a party." Fed. R. Civ. P. 25(d). Accordingly, the Clerk is directed to update the docket to reflect that Gina Raimondo is the current Secretary of the United States Department of Commerce.

[2] Also pending before the Court is Plaintiff's Motion for Extension of Time to File a Reply, ECF No. 43, which is granted.

I.      **BACKGROUND**[3]

Plaintiff William Wojtkowski began working for the U.S. Census Bureau as a mail clerk in 1984. ECF No. 39-4 at 2; *see also* ECF No. 39-11 at 1.[4] On January 4, 1998, he was reassigned to the Customer Engagement & Analytics Branch within the Bureau's Customer Liaison and Marketing Services Office ("CLMSO") and was made an Information Assistant. *See* ECF No. 42-20 at 2; *see also* ECF No. 42-19 at 2. More than a decade later, on March 29, 2009, he was detailed to the CLMSO's Education and Training Branch.[5] ECF No. 42-19 at 2–3; ECF No. 42-20 at 1; ECF No. 39-2 at 2; ECF No. 39-26 at 148. His title remained the same. ECF No. 39-2 at 2; ECF No. 42-19 at 2–3. That reassignment was made permanent on August 2, 2009. ECF No. 42-20 at 1; ECF No. 39-2 at 2. According to Plaintiff, despite his duties and responsibilities shifting in 2009, his title, position description, and grade did not. He remained an Information Assistant until his voluntary retirement at age 60 on July 31, 2017. ECF No. 39-4 at 2.

---

[3] Unless otherwise noted, the following facts are undisputed and construed in the light most favorable to the nonmoving party.

[4] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

[5] Plaintiff states in the Amended Complaint that he was moved *to* the Customer Engagement & Analytics Branch, rather than from it, ECF No. 23-1 ¶ 19; however, it is clear from the documents attached to Plaintiff's Opposition that this was not the case, *see, e.g.*, ECF No. 42-19 at 2–3; ECF No. 42-14 at 1; ECF No. 42-15 at 1. However, Plaintiff and two other members of a team focusing on conferences and exhibits were later moved back into the Customer Engagement & Analytics Branch as part of a broader CLMSO reorganization in 2015. ECF No. 42-1 at 10; ECF No. 39-12 at 3.

Documents attached to Defendant's Motion and Plaintiff's Opposition indicate that the Education and Training Branch was also called the "Data Education and Outreach Branch," ECF No. 42-9 at 1; ECF No. 42-11 at 14, the "Education, Dissemination & Outreach Branch," ECF No. 42-14 at 1; ECF No. 42-15 at 1, and the "Education, Training and Dissemination Branch," ECF No. 42-18 at 15.

**A. Plaintiff's Duties and Responsibilities**

The U.S. Census Bureau, headquartered in Suitland, Maryland, is best known for conducting the constitutionally-mandated decennial census, which, each decade, enumerates every individual in the U.S. and each person's place of residence. *See* ECF No. 39-24 at 13 (citing U.S. Const. art. I, § 2). In the "off years," however, the Bureau conducts housing, demographic, and economic censuses as well as many other annual surveys. *See id.* The CLMSO broadly focuses on facilitating customer access to, and use of, data that the Bureau collects and on communication between those customers and the Bureau. *See id.* at 14.

Plaintiff, as a member of the exhibits program, contributed to this overall mission by "enhanc[ing] the public's perception" of the Bureau and its services. ECF No. 39-5 at 3. He explained in a questionnaire regarding his position that the exhibits program used the "tradeshow experience to promote" Bureau products, including its mobile apps, such as America's Economy, Dwellr, and PoP Quiz, "to a wide range of data user communities." *Id*. Plaintiff coordinated logistics for trade shows, conferences, and other events and processed purchase orders for those events using a purchase card with a $25,000 monthly limit. ECF No. 39-4 at 3; ECF No. 42-11 at 14–15; ECF No. 39-5 at 2; ECF No. 39-11 at 1. Plaintiff was also part of the CLMSO's data dissemination team, which involved working in the call center responding to customer inquiries and informing various agencies and organizations about the data the Bureau provides. ECF No. 39-4 at 3–4; ECF No. 42-11 at 14–15; ECF No. 39-5 at 2–3; ECF No. 39-11 at 1.

**B. Comparators' Work**

As part of the exhibits program, Plaintiff worked with two "Marketing Specialists": Audrey Peay and Charles Pennington. The parties heavily contest whether Plaintiff's duties and responsibilities were the same as Ms. Peay's and Mr. Pennington's.

3

According to Plaintiff, events were divvied up among the team members, and each individual was generally responsible for all of the tasks related to planning a given event. ECF No. 39-26 at 151–52, 159, 162–63, 168. The amount of time each team member spent on event logistics was based on the number of events they were responsible for at a given time and whether they involved organizations with whom the Bureau had an existing relationship. *See id*. at 162–63. The only tasks that Ms. Peay alone performed were the preparation of reports about the team's work, which Plaintiff did only "[o]n a few occasions, very rarely," *id.* at 164; *see also id.* at 160; ECF No. 39-4 at 4–5, 7, 20, and managing three databases that the exhibits program used, *see* ECF No. 39-26 at 170–76; ECF No. 39-4 at 5, 9; *see also* ECF No. 39-26 47–48, 51–54, 69–72. However, Plaintiff contests the significance of these additional responsibilities—for example, he asserts that the calendar of events that Ms. Peay maintained was "nothing more than an Excel spreadsheet that has the event name, sponsoring division, project code . . . , event start/end date, and who will be staffing," concluding, "[t]his is not a 'high level report.'" ECF No. 42-21 at 4. Plaintiff also spent more time in the call center than the other team members, but he asserts that this was because the call center was understaffed, and he pitched in and worked more than his required weekly shift. *Id.*; ECF No. 39-4 at 4; *see also* ECF No. 39-26 at 111, 125–26, 135.

Mr. Pennington and two of the team's former supervisors support Plaintiff's view that he performed the same work as his team members. Specifically, Rachel Tellis, who had been Plaintiff's immediate supervisor for roughly three months at the time she wrote her affidavit in September 2015, stated that Plaintiff, Ms. Peay, and Mr. Pennington were "part of a team called the Exhibit Staff" and that, based on her observations, "they all perform the same work." ECF No. 39-12 at 3. She went on to state:

> All of them coordinate with people who want to secure a booth for certain events; all [] of them are credit card holders and assist customers make purchases but there may be differences in their credit line dollar amounts[; a]ll of them have to reconcile their purchases; all of them attend meetings with customers that require their assistance; and all of them attend the same training to retain their certifications. I would only add that [Plaintiff] does a lot of the packaging and those packages go to attendees at conferences and events.

*Id.* at 3–4. Michele Hedrick, who was Plaintiff's immediate supervisor from July 2012 to April 2013, states that, based on her observations, the three individuals had the same job duties and responsibilities. ECF No. 39-18 at 3. Finally, Mr. Pennington stated in an affidavit that he agreed with Plaintiff that "he is performing the same job duties and holds the same responsibilities as his co-workers (Ms. Audrey S. Peay and I). . . . [W]e all perform basically the same job duties. All of us coordinate conferences and exhibits on behalf of the Census Bureau and [Plaintiff] has been performing the same job duties since his arrival in 2009." ECF No. 42-22 at 2.

On the other hand, many of the team's other supervisors emphasize differences between the team members' work. For example, Schere Johnson Jordan, who was Plaintiff's immediate supervisor from August 2009 to September 2011, ECF No. 39-15 at 2, disputes that Plaintiff had the same responsibilities as Ms. Peay and Mr. Pennington. Ms. Johnson Jordan explains that, while the three had similar job duties related to exhibits and conference work, Plaintiff "did not perform the same volume of work in those areas as Ms. Peay and Mr. Pennington because he spent a lot of his time working with our call center staff." *Id.* at 3–4. Ms. Johnson Jordan also explains that Ms. Peay "did database management and survey management work," that Mr. Pennington "did lead coordinator work on conferences and exhibits – responding to new requests and distributing them amongst the other exhibits workers," that "Mr. Pennington handled the more complex overseas and interagency exhibits," and that Mr. Pennington was "the liaison for our maintenance contracts with vendors." *Id.* at 4.

5

Similarly, Kendall Johnson, who was Plaintiff's second-level supervisor from November 2010 to March 2015, ECF No. 39-16 at 2, acknowledged there were some similarities in the employees' job descriptions—namely, "[t]hey are all purchase card holders that process requests related to conferences and exhibits, and all of them work one shift or more (in the [Plaintiff's] case)" in the call center—but stated that there were also distinct differences, *id.* at 4–5. The differences include that Plaintiff had more responsibility for working in the call center, working four or five shifts per week to the others' one; that Mr. Pennington "is the customer's first point of contact for requests involving conferences and events" and assigns those requests to Plaintiff and Ms. Peay; that Ms. Peay "maintains the overall schedule for all exhibits and conferences" and creates reports about them that are submitted to "higher level management officials"; and that Ms. Peay was "instrumental in the development of a new database" housing information related to conferences and exhibits and that she reviews the data that Plaintiff and Mr. Pennington enter into it, as the database is the basis for the reports she sends to higher level management. *Id.*[6]

Kimberly Higginbotham, Plaintiff's immediate supervisor from January 2013 to January 2014, also provided an affidavit stating that Plaintiff and the other team members did not perform the same work, as "Ms. Peay was responsible almost exclusively for logistics tracking" and "Mr. Pennington was the lead conference coordinator," while Plaintiff would "assist their efforts" and also spent "significantly more time" in the call center than the other two individuals. ECF No. 39-17 at 2–3.

---

[6] Plaintiff asserts that Ms. Johnson's statements concerning Ms. Peay's work with "higher level management officials" and Ms. Peay's work on the new database are "exaggeration[s]." ECF No. 42-21 at 4.

Misty Reed, Plaintiff's immediate supervisor from January 2014 to January 2015, similarly focused on Plaintiff's role as an assistant to the two Marketing Specialists. ECF No. 39-22 at 2. She stated in an affidavit that only one aspect of Plaintiff's position was similar to that of the other team members' positions: his work on the conferences and exhibits program. *Id.* at 5. However, Ms. Reed said, "Mr. Pennington and Ms. Peay are also responsible for gathering data and producing high level reports," while Plaintiff "performs Information Assistant job duties" and "is responsible for assisting Mr. Pennington, Ms. Peay, and our customers get the work done." *Id.*

Mark Tolbert, Plaintiff's first-line supervisor from December of 2011 to June 2012 and again beginning in 2016, ECF No. 39-11 at 1; ECF No. 39-26 at 132–33, stated in an affidavit that Plaintiff's position description was not the same as Ms. Peay's and Mr. Pennington's, but that their branch chief was best qualified to provide details about their work. ECF No. 39-6 at 6. Mr. Tolbert then testified that Plaintiff spent more time in the call center than the other team members, and that "[m]ost of the core staff that handle the contact center operations were the lower grade – GS4 to 7 generally speaking." ECF No. 39-26 at 135. Mr. Tolbert emphasized that Ms. Peay produced reports using a comprehensive database, but that Plaintiff did not, as Mr. Tolbert "generally [] did not task him to do work that was clearly beyond his pay grade as a GS11 versus a GS5 or 6." *Id.* at 137.

Finally, Walter Tillman, Plaintiff's second-level supervisor for about three months at the time he wrote his affidavit in 2015, stated, "[b]ased on my own observations, the three employees are not performing the same job duties and do not have the same responsibilities. Ms. Tellis, their immediate supervisor, has also informed me that those employees do not perform the same job duties." ECF No. 39-13 at 3–4. However, during his deposition, he explained that

7

Plaintiff was under his "supervision with several layers, bureaucratic layers in between us," and that while he was "generally familiar with the duties he performed" and had "frequent meetings with [Plaintiff's] supervisors," Mr. Tillman "did not have day-to-day management" and was not aware of the "specifics" of Plaintiff's duties. ECF No. 39-20 at 5.

In addition to these supervisors' sworn statements and testimony, the record contains a progress review for Mr. Pennington stating that he "leads his team capably; he ensures that work is distributed equitably." ECF No. 42-15 at 8. Additionally, according to Plaintiff, Mr. Pennington also had a monthly limit of $75,000 on his purchase card, while Ms. Peay and Plaintiff had limits of $25,000. ECF No. 42-21 at 2. Plaintiff also testified that Mr. Pennington mentored Plaintiff when he first joined the team in 2009 and that Mr. Pennington was usually responsible for distributing work among the three team members. ECF No. 39-26 at 151–52; ECF No. 39-4 at 3, 20. Additionally, Ms. Peay testified that she performed significantly more work creating and maintaining databases than either Plaintiff or Mr. Pennington. ECF No. 39-26 at 47–48, 51–54, 69–72. She further estimates that between fifty and ninety percent of her work was similar to Plaintiff's at any given time. *Id.* at 81–82.

### C.  Government Pay Scale

The General Schedule (GS) is a federal pay scale that is divided into 15 numbered grades. *See* 5 U.S.C. § 5332(a); 5 U.S.C. § 5104; *see also* ECF No. 39-21 at 3. "[A]s the number of the grade increases, so do pay and responsibilities." *United States v. Clark*, 454 U.S. 555, 557 (1982). There are ten pay rates for grades 1 to 15, referred to as "steps." *See* 6 West's Fed. Admin. Prac. § 6674. "An employee automatically advances to a higher step in grade after specific periods of time, unless the employee's work is not of an acceptable level of competence." *Id.* Series—groupings of similar positions designated by a number, such as "GS-

403," ECF No. 39-21 at 3–4—are generally divided into two categories: one-grade interval work, that progresses from Grade 1 to Grade 2 to Grade 3 and so on, and usually ranges from Grade 2 to Grade 8; and (2) two-grade interval work, which increases from Grade 5 to Grade 7 to Grade 9 to Grade 11, at which point the positions follow a one-grade increase pattern, *id.* at 8–9.

From 2009 through 2015, Plaintiff was a Grade 5, Step 10 Information Assistant (GS-0303). *See* ECF No. 42-19 at 6. Records from Plaintiff's reassignment in 2009 state that the "position is at the full performance level or band." *Id.*; *see also* ECF No. 39-6 at 4. Plaintiff's position followed a one-grade interval pattern. *See* ECF No. 42-7 at 39. Ms. Peay and Mr. Pennington were both Marketing Specialists (GS-0301), a two-grade interval position, *see* ECF No. 39-21 at 27, who began at Grade 9 and progressed to Grade 11, *see* ECF No. 39-4 at 14; ECF No. 39-26 at 19.

"A federal employee may generally be promoted by one of three ways: 1) a competitive posting; 2) without further competition while occupying a career ladder position; or 3) the upgrading of a position based on accretion of duties as determined by a desk audit." *Radeline v. Gruenberg*, No. 1:15-CV-957, 2016 WL 1271037, at *1 (E.D. Va. Mar. 28, 2016), *aff'd*, No. 16-1416, 2016 WL 7321282 (4th Cir. Dec. 16, 2016). Relevant to this case, an accretion-of-duties promotion is a "promotion resulting from an employee's position being classified at a higher grade because of additional duties and responsibilities[.]" 5 C.F.R. § 335.103(c)(3)(ii). Generally, in an accretion-of-duties promotion, Human Resources conducts a desk audit, which is a review of a position to evaluate its proper title and grade. *See Radeline*, 2016 WL 1271037, at *1; *Haywood v. Gutierrez*, No. 1:08CV981 (GBL), 2009 WL 1208111, at *8 (E.D. Va. Apr. 30, 2009), *aff'd sub nom. Haywood v. Locke*, 387 F. App'x 355 (4th Cir. 2010). According to Catherine Hayes, a Supervisory Human Resources Specialist in the Bureau's Human Resources

9

Division, ECF No. 42-7 at 7, only a one-level promotion is possible through a desk audit and accretion-of-duties promotion—either one grade for a one-grade interval position or two grades for a two-grade interval position. *Id.* at 73. Additionally, a position cannot be changed from a one-grade interval pattern to a two-grade interval pattern through an accretion-of-duties promotion. *Id.* at 39–42; ECF No. 39-19 at 2–3.

### D. Desk Audit and Administrative History

Plaintiff first raised concerns about the misalignment between his new duties and his old title and pay to his supervisors when he was reassigned in April 2009. ECF No. 39-4 at 12. He continued to raise these concerns at his performance ratings every year. *See* ECF No. 39-2 at 4. In 2011, Ms. Hayes met with Plaintiff and explained that he could not be promoted from a one-grade interval position to a two-grade interval position without competition and that, in order to be promoted to Marketing Specialist, he would need to compete with others for the job. ECF No. 39-19 at 2–3; *see also* ECF No. 42-6 at 3; ECF No. 42-7 at 39–42. Mark Tolbert also stated that he informed Plaintiff that his grade and position description could not be reclassified, but that he encouraged Plaintiff to apply for available positions with promotion potential. ECF No. 39-6 at 4.

On January 15, 2013, Plaintiff sent an email to Human Resources requesting a desk audit—a review of his position for possible reclassification in a higher or lower grade. ECF No. 39-8; ECF No. 39-2 at 5. When, after five weeks, Human Resources did not respond to his email and two phone calls, he reached out to an individual at the Office of Personnel Management, who advised him to work within the Bureau to resolve the issue. ECF No. 39-2 at 5. After he had still not received a response in the wake of his performance rating in October 2013, Plaintiff

contacted Congresswoman Donna Edwards regarding his requests for reclassification. ECF No. 39-9; ECF No. 39-2 at 5.

Finally, on March 27, 2015, Plaintiff contacted an Equal Employment Opportunity ("EEO") counselor about alleged discrimination and retaliation based on Defendant's failure to perform a desk audit and reclassify Plaintiff's position. ECF No. 39-23 at 1. Plaintiff then filed a formal complaint reiterating what he had told the EEO counselor on May 26, 2015. ECF No. 9-3; ECF No. 39-4 at 17; ECF No. 39-24 at 1.

A desk audit was conducted in May and June by a contractor, Avie Jefferson. ECF No. 39-10 at 8–10; ECF No. 42-6 at 2.[7] Generally, a desk audit involves having the employee complete a questionnaire concerning the employee's duties, meeting with the employee, meeting with the employee's supervisor, drafting an evaluation, and having the HR division chief sign off on it. ECF No. 42-7 at 19–21. Plaintiff completed a questionnaire concerning his job responsibilities, ECF No. 42-5 at 1; ECF No. 42-6 at 2; ECF No. 39-2 at 6; however, Plaintiff did not meet with Ms. Jefferson and there is no record of Ms. Jefferson meeting with Plaintiff's then-supervisor, Ms. Reed, ECF No. 39-2 at 6; ECF No. 39-11 at 2; ECF No. 42-6 at 2. According to Catherine Hayes, Ms. Jefferson also did not draft an evaluation or obtain the proper signatures on several forms. *See* ECF No. 42-7 at 55–57, 66–67. Ms. Jefferson nevertheless determined that Plaintiff's performance level should be a Grade 6 and drafted a new position description reflecting that promotion on June 16, 2015. ECF No. 42-9;[8] ECF No. 39-10 at 9.

---

[7] Catherine Hayes clarifies that Ms. Jefferson conducted a "position review," not a desk audit, but does not explain the distinction between the two, and she later states that Plaintiff "received a desk audit via a position review." ECF No. 39-19 at 4.

[8] Strangely, while Ms. Hayes testifies that Ms. Jefferson did not write an evaluation, ECF No. 42-9 is a document titled "Evaluation Statement" with Ms. Jefferson's name and the date at the bottom, suggesting Ms. Jefferson drafted the document.

On June 17, 2015, Ms. Reed told Plaintiff the promotion would be effective starting pay period 13, which would have been June 28, 2015. ECF No. 39-10 at 9; ECF No. 42-7 at 97–99. Ms. Hayes became Ms. Jefferson's supervisor on August 10, 2015. ECF No. 39-19 at 2; ECF No. 42-7 at 7. At some point afterward, an HR specialist came to Ms. Hayes' office and asked if she had information regarding Plaintiff's desk audit. ECF No. 39-19 at 4. Ms. Hayes searched through the department's files and "found a folder that contained documentation showing that Ms. Jefferson had completed a position review." *Id.* Ms. Hayes recognized that the desk audit file for Plaintiff was deficient and revised the position description. ECF No. 42-7 at 55–56, 63–64, 66–68. The promotion was then made effective on September 6, 2015. ECF No. 39-3; ECF No. 42-6 at 2. The Notification of Personnel Action states that the promotion was the "result of additional duties and responsibilities" and that "position is at the full performance level or band." ECF No. 39-3.

The Bureau issued a Final Agency Decision concerning the investigation of Plaintiff's EEO complaint on February 2, 2016, finding no evidence of discrimination. ECF No. 39-24 at 34. Plaintiff filed a Notice of Appeal, which was dismissed as untimely, as well as a request for reconsideration, which was denied. ECF No. 9-7; 9-9.

### E.  Procedural History

On August 21, 2017, Plaintiff filed a complaint in this Court alleging (1) sex discrimination in violation of Title VII, 42 U.S.C. §§ 2000e *et seq.*; (2) violation of the Equal Pay Act, 29 U.S.C. §§ 206(d) *et seq.*; (3) age discrimination in violation of the ADEA, 29 U.S.C. §§ 621 *et seq.*; and (4) retaliation in violation of Title VII, the Equal Pay Act, and the ADEA. ECF No. 1. On February 7, 2018, Defendant filed a Motion to Dismiss, or Alternatively, for Summary Judgment, arguing that Plaintiff failed to exhaust administrative remedies and, with

respect to his ADEA claim, failed to notify Defendant of his intent to sue. ECF No. 9. This Court denied Defendant's motion on September 14, 2018, ECF Nos. 13 & 14; however, the Court dismissed Plaintiff's Equal Pay Act claim, which the parties agreed was not properly before the Court. ECF No. 13 at 1. Plaintiff filed a Motion to Amend/Correct the Complaint on December 17, 2018, ECF No. 23, which was granted, ECF No. 26. The parties then engaged in discovery. On October 23, 2020, Defendant moved for summary judgment. ECF No. 39. Plaintiff opposed Defendant's motion on November 13, 2020. ECF No. 42. Defendant filed a reply on December 11, 2020. ECF No. 44.

## II.   STANDARD OF REVIEW

Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir. 2006). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute exists as to material facts. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). If the moving party demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322–23.

A material fact is one "that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248–49. However, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v.*

*Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). The Court may rely on only facts supported in the

record, not simply assertions in the pleadings, in order to fulfill its "affirmative obligation . . . to

prevent 'factually unsupported claims or defenses' from proceeding to trial." *Felty v. Graves-*

*Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 323–24).

When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## III.   DISCUSSION

### A.  Title VII and ADEA Discrimination Claims

Plaintiff brings a sex discrimination claim under Title VII, asserting that he received

unequal pay as compared to Ms. Peay, a female employee performing the same work. ECF No.

23-1 ¶¶ 52–61. Title VII makes it unlawful for an employer to "fail or refuse to hire or to

discharge any individual, or otherwise to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). Plaintiff further brings an

age discrimination claim under the Age Discrimination in Employment Act, asserting he was

unlawfully paid less than Mr. Pennington, a younger employee. ECF No. 23-1 ¶¶ 62–66. The

ADEA makes it "unlawful for an employer . . . to fail or refuse to hire or to discharge any

individual or otherwise discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §

623(a).

Where, as here, a plaintiff does not put forward direct evidence of discriminatory motive,

courts apply the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*,

411 U.S. 792, 802–03 (1973), to both types of claims. *See Evans v. Techs. Applications & Serv.*

*Co.*, 80 F.3d 954, 959 (4th Cir. 1996); *Causey v. Balog*, 162 F.3d 795, 800 (4th Cir. 1998) (citing

*Henson v. Liggett Group, Inc.*, 61 F.3d 270, 274 (4th Cir. 1995)).[9] Under that framework,

Plaintiff must first establish a *prima facie* case of discrimination, which requires that Plaintiff

show: "(1) []he is a member of a protected class; (2) []he 'suffered an adverse employment

action'; (3) h[is] job performance was satisfactory; and (4) the adverse employment action

occurred 'under circumstances giving rise to an inference of unlawful discrimination.'" *Swaso v.*

*Onslow Cty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017) (quoting *Adams v. Tr. of Univ.*

*of N.C.-Wilmington*, 640 F.3d 550, 558 (4th Cir. 2011)).

If a plaintiff establishes a *prima facie* case of unlawful discrimination, "a presumption of

illegal discrimination arises, and the burden of production shifts to the employer" to produce

evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle v.*

*Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011); *see Reeves v. Sanderson Plumbing Prod.,*

*Inc.*, 530 U.S. 133, 142 (2000). "If the defendant carries this burden of production, the

presumption raised by the prima facie case is rebutted." *Texas Dept. of Commun. Affairs v.*

*Burdine*, 450 U.S. 248, 255 (1981). In that circumstance, "the *McDonnell Douglas* framework—

with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture."

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510–11 (1993). The plaintiff must then prove,

by a preponderance of the evidence, that the legitimate reason asserted is pretextual—"that the

[employer's] proffered reason was not the true reason for the employment decision" and that the

plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also*

*Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516–20; *Adams v. Trs. of Univ. of*

---

[9] However, Title VII and ADEA claims are distinguishable in that, unlike a Title VII claim, an ADEA claim requires that the plaintiff prove "that age was the 'but-for' cause of the employer's adverse decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009).

*North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'" (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original)).

Defendants do not dispute that Plaintiff satisfies the first and third elements of his *prima facie* case, but challenge whether he can establish the second and fourth elements: that he suffered an adverse employment action and the circumstances surrounding that action gave rise to an inference of discrimination. ECF No. 39-1 at 15–20. Even assuming Plaintiff has met his burden, Defendants further argue that there was a legitimate, nondiscriminatory basis for the pay disparity and the failure to promote. *Id.* at 23–24. The Court addresses these arguments in turn.

### 1. Adverse Employment Action

The Fourth Circuit has explained that "[a]n adverse employment action is a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (quoting *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)). "An adverse action is one that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle*, 650 F.3d at 337 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

Plaintiff brings his Title VII and ADEA claims on the basis of pay discrimination, which is an actionable adverse employment action. *See, e.g.*, *Raines v. Am. Fed'n of Tchrs. - Maryland Pro. Emps. Council, AFL-CIO Loc. 6197*, No. CV ADC-19-1266, 2019 WL 4467132, at *5 (D. Md. Sept. 18, 2019) ("When an employee is subjected to unequal pay, it 'can, of course,

16

constitute a materially adverse employment action.'" (quoting *Butler v. N.Y. Health & Racquet Club*, 768 F.Supp.2d 516, 532 (S.D.N.Y. 2011)); *Poullard v. McDonald*, 829 F.3d 844, 854 (7th Cir. 2016). Additionally, Plaintiff's claim could be characterized as a failure-to-promote claim, as his pay could not be raised significantly except through a promotion to a different grade or step.[10] To the extent Plaintiff bases his claim on Defendant's failure to promote him to a grade or step that would eventually lead to him being paid similarly to his alleged comparators, the denial of such a promotion has also been found to be an actionable adverse employment action. *See, e.g.*, *Norman v. Rubin*, 191 F.3d 448, 1999 WL 739433, at *2 (4th Cir. Sept. 22, 1999) (unpubl. opin.) (per curiam) ("She was subjected to an adverse employment decision-the refusal to upgrade her position following the desk audit."); *Broadway v. Slater*, No. CIV. A. 99-2705, 2000 WL 235238, at *3 (E.D. La. Feb. 28, 2000) (finding the defendant's refusal to upgrade the plaintiff's position following a desk audit constituted an "ultimate employment decision" for purposes of stating a Title VII claim). Defendants argue that Plaintiff never applied for a promotion that could have placed him in a higher pay scale, ECF No. 39-1 at 8, 16; however, in this case, that argument is best considered as a legitimate non-discriminatory reason for the adverse employment action, and not an argument that there was not an adverse employment action.

Thus, Plaintiff has satisfied the second element of his *prima facie* claim.

---

[10] Plaintiff implicitly acknowledges this limitation as well as the fact that, even if promoted, he could not have been promoted to Ms. Peay's and Mr. Pennington's grade level immediately, but instead would have had to progress from GS-7 to GS-11 over several years. *See* ECF No. 42 at 33. Thus, even had Defendant granted his request and reclassified his series, a pay disparity would have remained between Plaintiff and his team members for several years. *See id.*

2. **Similarly-Situated Comparators**

Although it is not the only way to satisfy the fourth element of a *prima facie* case, *see Bryant v. Aiken Reg'l Med. Centers Inc.*, 333 F.3d 536, 545 (4th Cir. 2003), Plaintiff can support an inference of unlawful discrimination by showing "similarly-situated employees outside the protected class received more favorable treatment," *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004)). Where, as in this case, a plaintiff bases his allegations completely upon a comparison to an employee from a non-protected class, the validity of his *prima facie* case depends upon whether that comparator is indeed similarly situated. *Burdine*, 450 U.S. at 258 ("[I]t is the plaintiff's task to demonstrate that similarly situated employees were not treated equally.") (citing *McDonnell Douglas*, 411 U.S. at 804). Accordingly, a plaintiff is required to show that he is similar in all relevant respects to his comparator. *Williams v. Silver Spring Volunteer Fire Dep't*, 86 F. Supp. 3d 398, 420 (D. Md. 2015) (quoting *Sawyers v. United Parcel Serv.*, 946 F. Supp. 2d 432, 442 (D. Md. 2013) *aff'd*, 576 Fed. App'x 199 (4th Cir. 2014)); *Popo v. Giant Foods LLC*, 675 F. Supp. 2d 583, 589 (D. Md. 2009) ("[A]n employee need not show complete identity in comparing himself to the better treated employee, but he must show substantial similarity." (quoting *Radue v. Kimberly–Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000))); *Saxton v. Town of Irmo Police Dep't*, No. CV 3:15-1244-JFA, 2017 WL 676579, at *3 (D.S.C. Feb. 21, 2017) ("Similarly-situated employees do not have to have the exact same position or title, but they must be similarly situated in all relevant aspects.").[11]

"[T]here is no bright-line rule for what makes two jobs 'similar' under Title VII," but "courts consider 'whether the employees (i) held the same job description, (ii) were subject to the

---

[11] "While Title VII's 'similarity' requirement demands less of plaintiffs than the Equal Pay Act's 'equality' requirement, it is not toothless[.]" *Spencer v. Virginia State Univ.*, 919 F.3d 199, 207–08 (4th Cir.), *as amended* (Mar. 26, 2019), *cert. denied*, 140 S. Ct. 381 (2019).

same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision.'" *Spencer v. Virginia State Univ.*, 919 F.3d 199, 207–08 (4th Cir.), *as amended* (Mar. 26, 2019), *cert. denied*, 140 S. Ct. 381 (2019) (quoting *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005); *see also Herster v. Bd. of Supervisors of Louisiana State Univ.*, 887 F.3d 177, 185 (5th Cir. 2018) ("A variety of factors are considered when determining whether a comparator is similarly situated, including job responsibility, experience, and qualifications."). "[T]he purpose of the similarly situated requirement is to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel[.]" *Pense v. Maryland Dep't of Pub. Safety & Corr. Servs.*, No. CV PWG-17-1791, 2020 WL 5946574, at *3 (D. Md. Oct. 7, 2020) (quoting *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)).

Plaintiff argues that he and the two Marketing Specialists on his team—Ms. Peay and Mr. Pennington—were similarly situated in all relevant respects, as they conducted the same work, were on the same team, reported to the same supervisors, and were subject to similar evaluation metrics. *See* ECF No. 42 at 24, 26–27. Plaintiff supports his argument with a statement by Mr. Pennington, submitted in the underlying administrative proceeding, that Plaintiff "is performing the same job duties and holds the same responsibilities as his co-workers (Ms. Audrey S. Peay and I)." ECF No. 42-22 at 2. He also points to the beliefs of two of eight supervisors who also submitted affidavits in that proceeding, Rachel Tellis and Michele Hedrick, stating that the three team members did the same work. ECF No. 39-12 at 3–4; ECF No. 39-18 at 3.

Plaintiff acknowledges some differences in the three team members' duties—namely, he spent more time in the call center, while Ms. Peay prepared reports and managed several

19

databases, and Mr. Pennington assigned work among the three individuals, mentored Plaintiff when he first joined the team, and was a "team leader." *See generally* ECF No. 42-21; ECF No. 39-4 at 3; ECF No. 39-26 at 154. However, he argues that the three were still similarly situated, asserting that Defendant exaggerates Ms. Peay's time and involvement in report preparation and database management, that Plaintiff was Mr. Pennington's and Ms. Peay's peer, not their assistant, and that Plaintiff only spent more time in the call center because it was short-staffed, and he was working extra shifts beyond the requirement in his job responsibilities. ECF No. 42 at 17–18, 26; ECF No. 42-21.

In contrast, Defendant seizes upon these differences as clear evidence that Plaintiff was not performing the same work as his Grade 11 colleagues and was properly found to be working at a Grade 6 level. Defendant points to six supervisors' statements and testimony that Plaintiff's work was not the same as that of the other team members as well as to testimony from Ms. Peay concerning her additional duties. *See* ECF No. 39-15 (declaration of Schere Johnson Jordan); ECF No. 39-16 (declaration of Kendall Johnson); ECF No. 45-1 (second declaration of Kendall Johnson); ECF No. 39-17 (declaration of Kimberly Higginbotham); ECF No. 39-22 (declaration of Misty Reed); ECF No. 39-6 (declaration of Mark Tolbert); ECF No. 39-13 (declaration of Walter Tillman); ECF No. 39-20 (deposition of Walter Tillman); ECF No. 39-26 (transcript of hearing at which Ms. Peay, Ms. Reed, Ms. Tellis, and Mr. Tolbert testified).

"The burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981). Mindful that the *prima facie* case is a "relatively easy test," *Young v. Lehman*, 748 F.2d 194, 197 (4th Cir. 1984), given the conflicting reports of his supervisors and coworkers, and drawing all inferences in Plaintiff's favor, the Court finds a genuine dispute of material fact exists concerning whether Plaintiff and

20

the Marketing Specialists were similarly situated. Thus, Plaintiff can establish a *prima facie* case of discrimination.

### 3. Legitimate, Nondiscriminatory Reason

Because Plaintiff has established a *prima facie* case of discrimination, the burden shifts to Defendant to proffer a legitimate, nondiscriminatory reason for the disparity in pay and position between Plaintiff and his teammates. *See Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011). As its primary argument, Defendant asserts that the legitimate reason for the pay disparity was the difference in responsibility between Plaintiff and the two comparators. ECF No. 39-1 at 24. Additionally, Defendant has put forward evidence that Plaintiff could not have been noncompetitively reclassified to a different series through a desk audit and accretion-of-duties promotion, and thus could not have been promoted to Marketing Specialist without applying for a competitive promotion. *See* ECF No. 39-1 at 5, 16; ECF No. 39-19 at 3–4; *see also* ECF No. 42-7 at 39–42, 65, 72–73. Only a one-level promotion was otherwise possible, which Plaintiff eventually received. *See* ECF No. 39-3. Multiple individuals encouraged Plaintiff to apply for competitive promotions that would have come with more pay, but he did not. *See* ECF No. 39-6 at 4 (Mr. Tolbert encouraged him to apply for a position with promotion potential); ECF No. 39-16 at 3 (Ms. Johnson created a career ladder position with promotion potential for which Plaintiff "was highly qualified" and sent Plaintiff and others an email about the vacancy encouraging them to apply).[12] Thus, this explanation provides a second nondiscriminatory basis for the failure

---

[12] Plaintiff asserts that he was not qualified for the particular position that was posted and that the job was posted when he went on vacation, so he did not learn about the opening until he returned, when it was too late to apply. *See* ECF No. 39-4 at 16–17; ECF No. 42-21 at 4.

to promote Plaintiff to Marketing Specialist and resolve the pay disparity between Plaintiff and his exhibits program colleagues.[13]

As a result, there is "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action," *St. Mary's Honor Ctr.*, 509 U.S. at 509, shifting the burden of persuasion back to Plaintiff.

### 4. Pretext

Accordingly, in order to proceed to trial, Plaintiff must demonstrate that Defendant's rational is pretext by proving "*both* that the reason was false, *and* that discrimination was the real reason." *Adams v. Trs. of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original). The former may help show the latter—"a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000). Indeed, "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Id.* at 147. However, it will not automatically be enough. *See id.* at 148.

---

[13] Although Defendant positioned this argument as part of its claim that Plaintiff did not suffer an adverse employment action, the *prima facie* case and a Defendant's legitimate, non-discriminatory basis often overlap in the *McDonnell-Douglas* analysis. *See Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008) (finding that where a plaintiff claims "that an employer's legitimate expectations were disparately applied, the second and fourth elements of the *prima facie* case are closely intertwined with the pretext analysis, and the two inquiries may be merged and considered together"); *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 807 (7th Cir. 1999) (finding the second "element of the *prima facie* case dovetails with the issue of pretext; both inquiries focus on the factual question of whether [the plaintiff] was providing an adequate standard of patient care" and proceeding to "frame the case in terms of pretext" and assume the plaintiff made out a *prima facie* case). Plaintiff had the opportunity to rebut this argument and did not.

The Fourth Circuit has instructed that, "[w]hile reviewing the employer's articulated reasons for discharge and the plaintiff's refutation thereof, [the court] must keep in mind that 'Title VII is not a vehicle for substituting the judgment of a court for that of the employer.'" *DeJarnette v. Corning Inc.*, 133 F.3d 293, 298–99 (4th Cir. 1998) (quoting *Jiminez*, 57 F.3d at 377); *see also Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 272 (4th Cir. 2005) ("We do not sit as a 'super-personnel department weighing the prudence of employment decisions' made by the defendants." (quoting *DeJarnette*, 133 F.3d at 299)). The court's "sole concern" is whether the decision was discriminatory. *DeJarnette*, 133 F.3d at 299; *see also Smith v. Univ. of North Carolina*, 632 F.2d 316, 346 (4th Cir. 1980) ("[The] law does not require, in the first instance, that employment be rational, wise, or well-considered—only that it be nondiscriminatory." (quoting *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1156–57 (2d Cir. 1978))).

Here, Defendant has provided two legitimate non-discriminatory reasons for the pay disparity: the dissimilarity in job responsibilities between Plaintiff and his identified comparators and the inability to promote him to a two-grade interval position, such as "Marketing Specialist," without a competitive promotion, for which Plaintiff did not apply. As an initial matter, the Court has already determined that there was at least a genuine dispute of material fact regarding whether Ms. Peay and Mr. Pennington were comparators for the purpose of establishing a *prima facie* case. But that is different from establishing that the stated rationale was a pretext. *Cf. Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 251 (4th Cir. 2015) ("[T]he causation standards for establishing a prima facie retaliation case and proving pretext are not identical[,]" and the former is "'less onerous.'" (quoting *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989)). To establish that Defendant's reasoning was pretext, Plaintiff must demonstrate

23

"that the defendant's explanation for an employment decision is 'unworthy of credence' or that the defendant's explanation is false." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 269 (4th Cir. 2005) (quoting *Reeves*, 530 U.S. at 147). Stated differently, "[a] plaintiff may demonstrate pretext by showing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.'" *Fordyce v. Prince George's Cty. Maryland*, 43 F. Supp. 3d 537, 550 (D. Md. 2014) (quoting *Pastran v. K–Mart Corp.*, 210 F.3d 1201, 1206 (10th Cir. 2000)). Although Plaintiff seeks to minimize the differences between his work and that of his comparators, even viewing the record in the light most favorable to Plaintiff, he has not shown the positions were sufficiently similar that Defendant's stated reasons for not promoting him—that he did not have the same responsibilities as Ms. Peay and Mr. Pennington—are unworthy of credence. For example, Plaintiff acknowledges that Mr. Pennington was the "team leader," that he assigned work to the other two team members, and that he had a higher purchase card amount. ECF No. 39-26 at 151–54; ECF No. 42-21 at 2; ECF No. 39-4 at 3. And Plaintiff recognizes that, even if Ms. Peay is exaggerating her role in drafting reports and managing databases, she still performed work that he did not. ECF No. 39-4 at 4–8, 20; ECF No. 39-4 at 3–4. Additionally, regardless of the reasons, he acknowledges that he spent more time working in the call center than either of the other two team members—at least six hours a week spread over three or four days. ECF No. 39-4 at 4; ECF No. 42-21 at 4.

Regarding Defendant's second non-discriminatory basis, Plaintiff does not rebut Defendant's contention that Plaintiff did not apply for a competitive promotion, which would be

the only way Defendant could have significantly increased his pay.[14] Plaintiff instead points to

deficiencies in the desk audit process to build the inference that Defendant's stated reasons for

not promoting him were pretext—namely, the failure to meet with Plaintiff and his supervisor

and to have a Human Resource Division employee review the findings. *See* ECF No. 42 at 9, 34;

*see also* ECF No. 42-7 at 19–21, 48, 55–56, 63–64, 66–68; ECF No. 39-2 at 6; ECF No. 39-11 at

2; ECF No. 42-6 at 2. However, as in *Haywood v. Gutierrez*, "the Court rejects Plaintiff['s]

premise that Defendant's proffered reason is pretext just because the desk audit was not perfect. .

. . [T]he Court's inquiry is focused on discrimination, not negligence." No. 1:08CV981 (GBL),

2009 WL 1208111, at *8 (E.D. Va. Apr. 30, 2009), *aff'd sub nom. Haywood v. Locke*, 387 F.

App'x 355 (4th Cir. 2010).

  Finally, factors that typically support a finding of pretext do not exist here. Defendant has

not offered varying explanations over time, *cf. EEOC v. Sears*, 243 F.3d 846, 852–53 (4th Cir.

2001), and there has been no "late appearance" of a justification raising an inference that it is a

"post-hoc rationale," *id.* at 853. Accordingly, Plaintiff has not shown that either of Defendant's

explanations were false or unworthy of credence.

  Even if he could, it would not be sufficient to establish pretext here. As stated above,

Plaintiff must not only show Defendant's explanation is false, but also that discrimination is the

real reason for the adverse action. *Adams v. Trs. of Univ. of North Carolina-Wilmington*, 640

F.3d 550, 560 (4th Cir. 2011); *see also Collins v. Baltimore City Bd. of Sch. Comm'rs*, 528 F.

App'x 269, 273 n.7 (4th Cir. 2013). Plaintiff's own subjective beliefs that Defendant would not

---

[14] Indeed, he recognizes that, even had he been reclassified as a Marketing Specialist in 2009, he could only have progressed to GS-7 in 2011, and to GS-11, the same grade as his colleagues, in 2013, presumably because of time-in-grade requirements. *See* ECF No. 42 at 33. However, while he seems aware of those limitations on promotions, he does not account for or acknowledge Defendant's allegations that a one-grade interval position cannot be reclassified as a two-grade interval position through a desk audit and accretion-of-duties promotion.

promote or reclassify him due to his sex or age are not enough to support his claim. *See Moore v. Reese*, 817 F. Supp. 1290, 1295 (D. Md. 1993). He must point to independent facts. *See id.*

Here, there is nothing in the record that suggests discrimination based on gender or age. The only support for Plaintiff's claim is the disparity in pay and position between him and his comparators, Ms. Peay and Mr. Pennington. But for any support that one comparator provides to one claim, that same comparator tends to negate the other claim. Specifically, Ms. Peay is similar in age to Plaintiff, weakening his age discrimination claim, while Mr. Pennington is also male, undercutting his sex discrimination claim. *See Ryan v. McAleenan*, No. CV ELH-19-1968, 2020 WL 1663172, at *19 (D. Md. Apr. 3, 2020) ("[S]everal of the individuals selected by TSA for the SBDO positions are within plaintiff's protected class. Thus, it is simply not plausible to infer that TSA's hiring decisions with respect to the SBDO position were driven by impermissible animus.") (citing *Booth v. Maryland*, 327 F.3d 377, 383 (4th Cir. 2003)). Additionally, Plaintiff had male supervisors who allegedly denied his requests for desk audits and promotions, which similarly counsels against a finding of sex discrimination. *See Ryan*, No. CV ELH-19-1968, 2020 WL 1663172, at *20 (citing *Coggins v. Gov't of District of Columbia*, 173 F.3d 424, 1999 WL 94655, at *4 (4th Cir. 1999) (table opinion); *James v. Verizon*, 792 F. Supp. 2d 861, 869–870 (D. Md. 2011)).

Ultimately, at the summary judgment stage, courts must evaluate whether Plaintiff has presented sufficient evidence to support a finding of discrimination. *See U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983); *see also Poullard v. McDonald*, 829 F.3d 844, 854 (7th Cir. 2016) ("Whether a plaintiff uses the direct, indirect, or 'convincing mosaic' methods of proof, the fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination."). Plaintiff has failed to show that the

differences in position and pay between him and his team members was the result of discrimination, either on the basis of age or sex. Therefore, summary judgment is granted with respect to Plaintiff's discrimination claims under both Title VII and the ADEA.

## B.  Title VII and ADEA Retaliation Claims

Title VII makes it unlawful for an employer to retaliate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3. Employment practices made unlawful by Title VII are those that discriminate against employees on the basis of race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e–2. The ADEA similarly prohibits an employer from retaliating against an employee who has opposed unlawful discrimination, albeit, of course, with respect to age discrimination. *See* 29 U.S.C. § 623(d). To establish a *prima facie* case of retaliation, a plaintiff must present facts that establish that (1) the plaintiff engaged in a protected activity; (2) the employer took an adverse employment action against the plaintiff; and (3) "there was a causal link between the two events." *Boyer–Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015).[15]

The *McDonnell Douglas* framework applies to retaliation claims as well as discrimination claims. *See Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). As described above, under that framework, after a plaintiff establishes a *prima facie* case of retaliatory discrimination, the burden then shifts to the employer "to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Foster v. Univ. of Maryland–E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015). If the employer makes this showing, the

---

[15] Because the language of the retaliation provisions in Title VII and the ADEA are identical in material respects, Title VII precedent governs the burdens of proof under the ADEA. *See, e.g.*, *Blistein v. St. John's College*, 860 F. Supp. 256, 268 n. 16, *aff'd*, 74 F.3d 1459 (4th Cir. 1996); *Cornelius v. City of Columbia*, 663 F. Supp. 2d 471, 476 (D.S.C. 2009), *aff'd sub nom. Cornelius v. Columbia, City of, S.C.*, 399 F. App'x 853 (4th Cir. 2010) (citing *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998)).

burden shifts back to the plaintiff to demonstrate that the employer's purported non-retaliatory reasons "were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Burdine*, 450 U.S. at 253)). The parties do not dispute that Plaintiff engaged in protected activity in March 2015, when he initiated his first informal EEO complaint at the agency level, and that his supervisors learned about that EEO activity no later than April 23, 2015. *See* ECF No. 39-1 at 26; ECF No. 42 at 30.[16] However, Defendant argues Plaintiff has failed to satisfy the second and third elements of a *prima facie* case of retaliation. ECF No. 39-1 at 26.

### 1. Adverse Action

To satisfy the second element of a retaliation claim, Plaintiff must point to actions that were "'materially adverse'— such that they 'might have dissuaded a reasonable worker' from engaging in protected activity." *Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).[17] Title VII's anti-retaliation provision thus "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington*, 548 U.S. at 67; *see also Ray v. Int'l Paper Co.*, 909 F.3d 661, 667 (4th Cir. 2018). The Fourth Circuit has found that "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for

---

[16] Although Plaintiff also stated in the Amended Complaint that he engaged in protected activity when he raised concerns about his pay during his performance evaluations, ECF No. 23-1 ¶ 68, he does not raise this argument in his Opposition, thus conceding it. Even had he raised it, this argument would fail at this stage, as the record does not show that he stated that his pay was unequal to his team members or was discriminatory on the basis of age or sex during those evaluations.

[17] Notably, while "adverse action" mirrors the "adverse employment action" requirement for discrimination claims, the Fourth Circuit has clarified that "adverse action" is broader in that it "need not be employment or workplace-related in order to sustain a retaliation claim." *Strothers*, 895 F.3d at 327; *see also Burlington*, 548 U.S. at 64 ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."). Here, under either standard, Plaintiff satisfies this element.

promotion" constitute adverse actions. *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999). On the other hand, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'" *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 738 (D. Md. 2009) (quoting *Burlington*, 548 U.S. at 68). Nor does "a personal conflict alone . . . constitute retaliation." *Spencer v. Va. State Univ.*, 919 F.3d 199, 208 (4th Cir. 2019).

In his Opposition, Plaintiff focuses specifically on his being promoted to Grade 6 after the desk audit, and not being promoted to the Marketing Specialist series. ECF No. 42 at 31–32. That Plaintiff was promoted one grade does not negate the existence of an associated adverse action—otherwise, employers could skirt a discrimination or retaliation claim merely by offering an employee some morsel of increased pay or promotion. *Cf.* ECF No. 39-1 at 30 ("Surely had the Defendant sought to retaliate against Plaintiff, he would not have received a promotion."). Instead, Plaintiff argues successfully that the failure to promote him to the Marketing Specialist series, and thus the failure to pay him commensurate with his team members, was an adverse employment action.[18]

### 2. Causal Nexus

Although Plaintiff identifies an adverse action—the failure to promote and pay him equally to his teammates—Plaintiff's claim nevertheless fails at the third element: the causal nexus between the protected activity and the adverse employment action. To satisfy the third element, a plaintiff must show that "the employer [took] the adverse employment action *because*

---

[18] However, to the extent that Plaintiff further argues in his Opposition that the desk audit itself was an adverse action because it was improperly performed, ECF No. 42 at 32, that argument fails, as procedural flaws in a desk audit do not amount to materially adverse actions that would dissuade a reasonable worker from engaging in protected activity. *Cf. Haywood v. Gutierrez*, No. 1:08CV981 (GBL), 2009 WL 1208111, at *8 (E.D. Va. Apr. 30, 2009), *aff'd sub nom. Haywood v. Locke*, 387 F. App'x 355 (4th Cir. 2010).

the plaintiff engaged in a protected activity." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (emphasis in original). Pursuant to the Supreme Court's ruling in *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, "a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." 570 U.S. 338, 362 (2013). In evaluating causation at the *prima facie* stage of the retaliation analysis, courts often consider: (i) whether the allegedly retaliatory actor was aware that the plaintiff had engaged in the protected activity at the time of the allegedly retaliatory act and (ii) the temporal proximity between the protected activity and the allegedly retaliatory act. *See Baqir v. Principi*, 434 F.3d 733, 748 (4th Cir. 2006) (holding that a plaintiff had not established a *prima facie* case of retaliation where he had not shown that the allegedly retaliatory actors were aware of his protected activity); *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (determining that a lengthy period of time between the employer becoming aware of the protected activity and the alleged adverse employment action negated any inference that a causal connection existed). In order for temporal proximity alone to satisfy the causation prong of the *prima facie* case, the temporal proximity must be "very close." *Allen v. Rumsfeld*, 273 F. Supp. 2d 695, 707 (D. Md. 2003) (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273, (2001)).

Here, Plaintiff argues that Defendant failed to pay or promote him appropriately beginning in 2009. ECF No. 42 at 22. While this allegedly discriminatory pay continued after Plaintiff filed the EEO complaint, the fact that the disparity in pay and position long preceded that event cuts against a finding that the filing of the complaint caused the discriminatory pay.[19]

---

[19] To the extent Plaintiff bases his claim on the denial to perform a desk audit, that argument fails for the same reason, as the refusals to perform desk audits predated Plaintiff's filing of the EEO complaint. *See* ECF No. 42 at 32. To the contrary, after the complaint was filed, Defendant finally performed a desk audit, suggesting the complaint

*See Allen*, 273 F. Supp. 2d at 707; *see also Norman v. Rubin*, 191 F.3d 448, 1999 WL 739433, at *2 (4th Cir. Sept. 22, 1999) (unpubl. opin.) (per curiam) (finding the plaintiff had not satisfied the third element where the refusal to upgrade her position took place before the plaintiff filed her EEO complaint). Nor has Plaintiff offered any other evidence raising an inference of a causal relationship between the protected activity and the adverse action.[20] Without any facts plausibly connecting the two, Plaintiff has not established a *prima facie* case of retaliation. Therefore, his retaliation claim fails.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion is granted. A separate Order follows.

Date: <u>May 24, 2021</u>                                 ___/s/_____

GEORGE J. HAZEL
United States District Judge

---

caused the performance of a desk audit rather than the refusal to perform one. Additionally, federal courts have found the denial of a desk audit is not an adverse employment event. *See Dollis v. Rubin*, 77 F. 3d 777, 782 (5th Cir. 1995), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

[20] As Plaintiff points out, it is plausible based on the timing of the desk audit—immediately after the complaint was filed—that the promotion to Grade 6 was a defensive move against Plaintiff's discrimination claims, intended to placate Plaintiff. Even if true, it suggests that he received a benefit, and not a harm, as a result of his complaint.